HALTIWANGER v. WINDHORN.

1. ADMINISTRATOR—BUSINESS OF INTESTATE—HOMESTEAD—ESTOPPEL.—An administrator should not undertake to carry on his intestate's livery stable business; but where the administrator promptly submitted the estate to the court for settlement, making the widow a party, and she failed to answer for ten months, and took three horses in part of her chattel exemption under the homestead laws some time after administration granted, the livery stable business being carried on meantime, and the estate thereby exhausted in feed, care, and rent, the widow cannot demand that the administrator shall make up to her the amount of money that the property received by her fell short of $500—no creditor or distributee, as such, complaining.

Before FRASER, J., Richland, April, 1894.

Action by P. H. Haltiwanger, as administrator of Theodore Windhorn, deceased, against Amanda J. Windhorn and others, commenced October 5, 1891.   The circuit decree was follows:

This case was heard by me at the term of the court in April, 1894.   The action was brought by the plaintiff as administrator, for the settlement of the estate of Theodore Windhorn, deceased, against Amanda J. Windhorn and others.   There were no children, and Amanda J. Windhorn seems to have constituted "the family" of the intestate.   Amongst the orders in this case, was one requiring the administrator to account before the master.   Instead of an accounting, the master, by the consent of the counsel, has only reported the testimony as to the administration and as to the claims against the estate. I, therefore, will confine my attention to the single point raised by the arguments before me—the widow's right of homestead.

It appears that the personal property of the intestate consisted almost entirely of horses, vehicles, harness, and other articles used in carrying on the livery stable business—amounting in value to considerably over $500.   The exact amount was not furnished me in any of the papers furnished me at the hearing.   The plaintiff became the administrator at the request of the widow.   The letters were granted on the 26th day of June, 1891.   On August 6th, 1891, on a petition by the administrator, an order was made by the judge of probate, authorizing the administrator to sell the property at public or private sale.   No time was fixed for sale, and the terms of sale were left in the discretion of the administrator.   Constant efforts were made to sell the property—a portion of it at private sale.   But sales could not be made at what was considered fair prices.   A large amount of the property remained until a sale was made under an order made in this case, after the commencement of this action, in October, 1892.   In the meantime, the administrator, with this stock, carried on the livery stable business at a heavy expense, and, as it turned out, a heavy loss.   When the property was finally sold, the expenses had consumed the property, and nothing was left for the creditors or distributees—even for the homestead, unless the administra-

tor had made himself personally liable for it, by his method of dealing with the estate.

By an order made in this case, some personal property was turned over to the widow on account, and as part of her homestead, amounting to two hundred and twenty-five dollars. Besides this, several other articles have been turned over to her, the value of which may be ascertained, if necessary. The widow now claims that the administrator is liable to make good this loss to her, and that he must be required to pay her the full amount of the homestead, in the same way as if the sales of the property had been sufficient to leave a balance in his hands for that purpose, over and above expenses. Let us assume that all of the property of the intestate passed into the hands of the administrator in trust, for the preservation of the family homestead, and thereafter for the creditors and distributees. This I take to be the better view—at least, until the homestead is severed and is set apart. In *Lamb* v. *Lamb*, Speer Eq., 301 and 302, the court declined to hold an administrator liable "for losses in a lot of cotton held for some three months after a positive order to sell it. He acted in good faith, and, as he thought, for the benefit of the estate. He is not to be held liable for an error of judgment." In *Rainsford* v. *Rainsford*, Rice's Eq., 369, the court used this language: "The obligation imposed on a trustee is, that he shall manage the trust in the same manner that a discreet man would manage his own business; and he is accountable if he neglects this duty."

The administrator seems to have acted under the advice of counsel—to have acted with great care—but all to have been very unfortunate. There is no absolute rule which requires that an administrator shall at once proceed to convert chattels into money as soon as practicable after the death of the intestate. At one time, and until very recently, such a course would have been the exception and not the rule in this State. I think, therefore, that the administrator is not liable for loss to the creditors and the distributees; and on the theory that he is also trustee, to preserve the homestead until it is severed and set apart, he should not be liable to the family for the homestead which has been lost in the process of the administration. It

may be said, however, that the homestead forms no part of the estate which comes to the administrator. Thompson on Homestead Exemptions, 546. If this view be correct, then it is a simple case where the goods of the two parties are commingled; and if the party in possession takes the same care that a reasonably prudent man would do of his own, he ought not to be liable for the losses, if the owner neglects to claim his property. I have been furnished with no authorities, and can find none to this purpose.

My view is this: When the administrator took charge of the estate, he is bound to take charge of everything left by the intestate. He cannot know, officially, at least, that there will be any necessity of laying off a homestead. If he did know this, he was powerless until the "family" (in this case the widow) resorts to the proceedings provided by law for setting off the homestead. The law has not provided any proceeding in which he is the actor. If this property remained in his hands mixed with other property, it was the widow's fault and not his. He could not turn out this stock to stray off, or keep it unfed and uncared for. He cannot certainly be blamed if he endeavored to make the property earn something, by continuing the old business in the proper way. If we take the view that no legal title to this property passed into the administrator, then he and the widow were simply cotenants. The cotenant in possession is responsible for due care. Freeman on Cotenancy and Partition. The work done did not cover the loss, but contributed to pay off some of the expenses.

There is no positive evidence on the subject, but the widow must have known what was going on. There certainly has not been any protest on her part against it. In the absence of any proper demand made on him for the homestead, I confess that I do not see what the administrator could have done other than to act as trustee of the whole property which came into his hands, including the homestead. In the view I have above presented, he acted with the best judgment and care he could, and in good faith, and is not to be held responsible for the unfortunate result.

I, therefore, hold that the plaintiff is not liable to the widow

for the amount of the homestead which has not been paid, and it is so ordered and adjudged. All questions not herein adjudicated are reserved.

The defendant appealed on the following grounds:

I. For that his honor erred in holding that the plaintiff administrator is not liable to the defendant, Amanda J. Windhorn, for the value of the property retained by said administrator in his hands, and to which she was entitled under the homestead and exemption laws of this State, and which property was lost to the said defendant, Amanda J. Windhorn, by reason of the unauthorized acts of the said plaintiff, administrator.

II. For that his honor erred in holding that plaintiff, as administrator as aforesaid, could lawfully carry on the business of a livery stable with the property of his intestate; and that when such business had resulted in a total loss, he could lawfully apply the proceeds of sales of intestate property to pay the indebtedness incurred in prosecuting such business to the exclusion of the claims of the widow of intestate for her homestead exemption in the said property.

III. For that his honor, after making a citation from Thompson on Homestead Exemptions, to the effect that the homestead forms no part of the estate which comes to the administrator, erred in holding: "If this view be correct, then it is a simple case where the goods of the two parties are commingled, and if the party in possession takes the same care that a reasonably prudent man would do of his own, he ought not to be liable for the losses, if the owner neglects to claim his property."

IV. For that his honor erred in not holding that if the foregoing citation be correct law, then the facts proven in this action make a case where the plaintiff administrator unlawfully used the homestead property to which the widow of deceased was entitled, in carrying on a livery stable business in behalf of the estate without her consent; and said business having resulted in a loss, the plaintiff administrator is liable to said widow for so much of the property of her deceased husband's estate as she was entitled to by way of homestead.

V. For that his honor erred in holding: "If this property re-

27—44

mained in his [the administrator's] hands mixed with other property, it was the widow's fault, and not his;" and in further holding: "In the absence of any proper demand made on him [the administrator] for the homestead, I confess that I do not see what the administrator could have done other than to act as trustee of the whole property which came into his hands, including the homestead."

VI. For that his honor erred in not holding that the answer of the defendant, Amanda J. Windhorn, in this cause, dated 8th September, 1892, wherein she alleges, "That she is entitled out of any and all the personal property belonging to said estate of her deceased husband, and out of any money derived from any portion of said decedent's estate, to a personal property exemption of $500," was a sufficient demand of her homestead exemption; and that any holding and using without her consent by the plaintiff administrator of the property in question (at least after said date) was tortious and illegal; and that said administrator is liable to the widow of deceased for the loss of said property in his hands caused by his acts.

VII. For that his honor erred in holding that "the widow must have known what was going on"—that is, what course of action in regard to the property was being pursued by the administrator—when, as his honor himself admits, "there is no positive evidence on the subject."

VIII. For that his honor erred in holding that the administrator "acted with the best judgment and care he could, and in good faith, and is not to be held responsible for the unfortunate result."

IX. For that his honor erred in not holding that the plaintiff, as a merchant, having sold to himself as administrator the articles whose price constitutes the principal claim against the estate, the transaction is one that the law will not uphold, even where there is no proof of bad faith.

X. For that his honor erred in not holding that the administrator has no legal right or power to apply the property of the intestate or the proceeds of sales thereof to the payment of a debt contracted by him while administrator, and acting as such,

with himself as a merchant, prior and in preference to the widow's claim of homestead.

XI. For that his honor erred in holding that, if "no legal title to the property passed into the administrator, then he and the widow were simply cotenants."

XII. For that his honor erred in not holding that it was the duty of the administrator, as soon as he had become appointed and qualified, or, at any rate, as soon as the defendant, Amanda J. Windhorn, had served her answer in this case, to set apart personal property of the estate of intestate to the value of $500, or that amount of money (provided property to that value or that amount of money came to his hands), to be delivered to the said Amanda J. Windhorn, as the widow and "family" of intestate, for her homestead.

XIII. For that his honor erred in not holding that no sufficient reason had been shown why the plaintiff administrator had not delivered the balance of her homestead to the widow, and such homestead having been lost by the acts of the administrator, he is liable to the widow for the amount of the homestead which has not been paid.

XIV. For that his honor erred in not holding that the widow's claim of homestead is paramount to all claims (except mortgages of the property and claims due the State) against the estate of her deceased husband, including debts contracted by the administrator as "expenses of preservation."

XV. For that his honor erred in not holding that the plaintiff administrator is estopped from asserting that no proper demand for the homestead had been made upon him.

XVI. That while it is true, as stated by his honor, that the administrator could not turn out the stock to stray off, or keep them unfed and uncared for, yet his honor erred in not further holding that the administrator could have turned over, or, at least, tendered to the widow, so much of said stock as was required to make good her homestead exemption; that if she refused to accept them, he could then charge the estate with the expense of their maintenance, provided good management required that they should be retained and not sold; and that,

having failed so to do, and by his subsequent conduct lost the property to the estate, he is responsible therefor.

XVII. For that his honor erred in not holding that the plaintiff administrator had no power to contract a debt so as to bind the estate and be superior to the widow's claim of homestead; and especially not to so contract with himself.

*Messrs. Obear & Douglass,* for appellant.

*Messrs. Clark & Muller,* contra.

July 20, 1895.   The opinion of the court was delivered by

MR. JUSTICE POPE.   Theodore Windhorn departed this life intestate on the 6th day of June, 1891, possessed of a tract of land containing 141 acres, about six miles from the city of Columbia, and six horses, nine vehicles, and other things pertaining to a livery stable, in which business the deceased was engaged at the time of his death.   The plaintiff, at the instance of the widow of intestate, had himself appointed to the office of administrator of the personal estate, and possessed himself thereof on the 25th day of June, 1891.   The intestate was survived by his widow, the defendant, Amanda J. Windhorn, a sister, and a nephew, as his only heirs at law and next of kin. The plaintiff found the livery stable of his intestate without food to feed the horses and with no one to care for the same, in a stable rented from another.   On his call for creditors, he found that one of the creditors held a mortgage on the 141 acres of land belonging to intestate for the sum of $500 and some interest.   He himself held claims for more than $400, and there were others besides.   In fine, his intestate had died insolvent.   He bought food to feed the stock, hired help to care for the same, and paid rent on the stables occupied as a stand by the intestate when he died.   The plaintiff applied to the probate judge for Richland County for leave to sell the horses at public or private sale; and an order was passed by such judge therefor.

On the 5th day of October, 1891, he exhibited his complaint in the Court of Common Pleas for Richland County against all the heirs at law of deceased and the holder of the only lien on

his real estate as parties defendant.   On the 5th of November, 1891, Judge Aldrich passed an order, which was consented to by every heir at law and the creditor who held the aforesaid lien, by which the plaintiff was authorized to turn over to the widow, Amanda J. Windhorn, on account of her homestead, one horse or one horse and a carriage.   The plaintiff still conducted the business of the livery stable, using alone in such business the property of his intestate, until about the close of the year 1891.   We found that he sold one horse in July and one in November, 1891, and that he attempted to sell the balance of the property on the 12th December, 1891, but, on account of the severity of the times, all of the property could not be sold at remunerative prices, and some of it was withdrawn from sale after offered by the auctioneer.   In 1892, about April, he turned over two other horses and a surry, with its harness, to the widow on further account of her homestead.   Notwithstanding the fact that the widow, the defendant, Amanda J. Windhorn, had appeared, by her attorney in this action, in November, 1891, yet her answer was not filed until *September, 1892.*   In her answer she set up a claim to the homestead, but acquiesced in the prayer of plaintiff's complaint, which was that he might be ordered to sell the personal property, and account therefor in this action.   In November, 1892, Judge Wallace passed a consent order in the action, validating the turning over of the three horses, valued in the aggregate at $225, to the widow as her homestead, and directing a sale by the master of the land in question, and directing the master to advertise for claims against the estate of the intestate, pass upon the account of the administrator, &c.   When the land was sold by the master, its proceeds paid the costs and the debt it was intended to secure.

When the master had the parties before him for an accounting touching the actings and the doings of the plaintiff as administrator, his accounts showed that he had paid out the whole estate except $14.37 in the course of his administration, leaving still due the counsel fees to his attorneys, and a balance of $275 to the widow on account of her homestead, while his own claims and those of others, in like plight with himself, were left with-

out any payment at all. When his accounts as said adminis-
trator were examined, it was discovered that the food of the
horses and the hire of persons to take care of them, as well as
rent for the stables, had exhausted the estate. *No creditors*
complained at this unexpected turn in the affairs of the estate;
but the widow, on account of the unpaid balance of her claim
of exemption of personal property, has assailed the actings
and doings of said plaintiff most vigorously—not his want of
good faith, or that his accounts are not accurately made as to
his receipts and disbursements, but solely because, as she views
it, it was his duty to pay her balance of $275. All these mat-
ters came on to be considered by his honor, Judge Fraser, on
the equity side of the Court of Common Pleas, at the spring
term, 1894, of said court for Richland, and on the 8th day of
May, 1894, he filed his decree, wherein he held that the plaintiff
was not liable to the widow for the amount of the homestead
which has not been paid. His decree will be set out in the
report of the cause. To this decree the defendant, Amanda J.
Windhorn, has appealed to this court upon seventeen grounds,
which will also be set out in the report of the case.

It is certainly the duty of an administrator to take care of
all perishable property of which the intestate died as owner
and possessor. Indeed, by law its ownership is devolved
upon him. This care includes seeing that the horses are
housed, fed and cared for, and that such property as car-
riages shall be under a roof, so as to be free from the effects of
exposure to the sun and rain. But the greater the expense,
usually the quicker should the administrator move to have a
sale, though the latter should be governed by business princi-
ples. It is no part of an administrator's business, as such, to
run a mercantile establishment, or, for that matter, a livery
stable, if his intestate died, leaving either one or the other of
such establishments, that passed into the hands of his adminis-
trator. We desire to speak emphatically upon this point. It
is too dangerous a custom for this court to sanction. In the
case at bar, no distributee or creditor of the intestate complains
of this administrator. Does it lie in the power of this defend-
ant to complain of the plaintiff because he had not paid her the

balance of her exemption of $500 of the personal property be-
longing to her husband's estate, under the circumstances of
this case? She is now in the Court of Equity and must be con-
trolled by its principles. Under the laws of this State, it was
in her power to require that this property should be set apart
to her. Under the law, it was no part of the duty of the ad-
ministrator to set it apart to her.

Therefore, to begin with, we have this defendant appellant
clothed with a legal right and legal process requisite to the en-
forcement of this right. On the contrary, the plaintiff owed
the defendant no such duty under the law, and under the law
was clothed with no process to set apart this exemption to her.
This plaintiff promptly brought his action in the court of the
country to settle the estate of his intestate. The appellant was
made a party to such action, and yet, for nearly one year, she
did not even answer the complaint setting up her rights. Be-
fore she did answer, all the harm had been done, the estate had
been spent. How was it spent? Not in buying more horses
and more vehicles; not in renting additional stables, but,
purely and simply, the six horses "ate their heads off," as the
popular phrase states it; the cost of their food, stabling and
care exhausted the estate. This result would not have ob-
tained if the appellant had taken the three horses, that she
afterwards obtained on account of her exemption, promptly
upon the accrual of her right, but she waited until the expenses
of feeding, stabling and care of the same three horses she re-
ceived had exhausted more than the amount of balance due
her. We have examined the accounts of the administrator, and
the foregoing facts appear therein.

Wherever these exceptions refer to the findings of fact of the
Circuit Judge, we find there is testimony in the "Case" sustain-
ing such findings, and under the well settled rule of law gov-
erning such matters, we would not overrule the Circuit Judge.
Wherever the exceptions relate to alleged errors in the conclu-
sions of law by the Circuit Judge, our foregoing observations
fully answer them.

It is the judgment of this court, that the judgment of the Cir-
cuit Court be affirmed.